IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 21, 2024

## CHRISTOPHER A. MAXWELL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Franklin County**
**No. 2020-CR-206   Justin C. Angel, Judge**

_____

### No. M2023-01090-CCA-R3-PC

_____

Petitioner, Christopher A. Maxwell, pleaded guilty to one count of first degree premeditated murder and two counts of attempted first degree premeditated murder, and was sentenced to an effective term of life plus twenty years. Petitioner filed a timely petition for post-conviction relief, which the post-conviction court denied after conducting a hearing. On appeal, Petitioner alleges he was denied the effective assistance of counsel and that his guilty pleas were entered unknowingly and involuntarily. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TOM GREENHOLTZ, JJ., joined.

Michael D. Hall, Winchester, Tennessee, for the appellant, Christopher Allen Maxwell.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Courtney Lynch, District Attorney General; and Thomas McEntyre, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**

I. Facts and Procedural History

On January 25, 2020, Franklin County emergency dispatchers received a 911 call from Holly Maxwell, who was Petitioner's wife. Mrs. Maxwell was very upset and told dispatchers that Petitioner had threatened, attacked, and fought her. She said that their two sons also were there at the family home, and were attempting to protect her from Petitioner. Mrs. Maxwell told dispatchers Petitioner had gone to the basement to retrieve a gun, and

Petitioner's voice could be heard in the background of the call yelling that he could not find it. Mrs. Maxwell then told the dispatchers Petitioner had a gun and could be heard telling her two sons to flee. Five gunshots could be heard on the recording of the call. When deputies with the Franklin County Sheriff's Department arrived at the home, Petitioner had left the house and fled to a barn elsewhere on the property. Officers found both of Petitioner's sons, H.M. and C.M., suffering from gunshot wounds from a shotgun.[1] They also found the body of Mrs. Maxwell, who appeared to have been shot at very short range by a shotgun.

Deputies found Petitioner in the barn, pacing back and forth and talking to himself. Body camera footage revealed that a deputy commanded Petitioner to come out with his hands up, but Petitioner yelled, "Kill me," and repeatedly told deputies to shoot him. Petitioner stated, "My G** d**n wife had been f*****g around on me forever and I had to kill her. Now you kill me. I ain't gonna live locked up, I ain't gonna live locked up." Petitioner told one of the deputies that "he was tired of going to Jack [Daniel's] and people telling him that his wife was cheating on him and he was tired of it and just killed her." Petitioner was arrested, and deputies found approximately twelve freshly empty beer bottles in the barn area where they encountered Petitioner.

On July 6, 2020, the Franklin Country Grand Jury returned a five-count indictment charging Petitioner with: first degree premeditated murder of Mrs. Maxwell (Count One); attempted first degree premeditated murder of H.M. (Count Two); attempted first degree premeditated murder of C.M. (Count Three); child abuse of H.M. (Count Four); and child abuse of C.M. (Count Five).

Petitioner underwent a forensic evaluation, where he repeatedly reported hallucinations and constantly heard radio "static." He stated he had heard the static in the past, but it stopped for two years in 2017 after he had a brain tumor removed, and the noise started again in September 2019. Petitioner also informed medical examiners that he had a history of hearing voices. He said it happened two to three times a week and the voices "Just tell you to do something. Give you orders." He stated that the commands were to hurt others, and he had never followed the command until the day of the incident. When asked what his chances were of being found not guilty, Petitioner replied, "Not very good," because "[t]here was no one else at the house who could've done it but me." The results of his psychological testing indicated he was malingering. The doctor opined that "a serious mental illness did not cause [Petitioner] to be unable to appreciate the nature or wrongfulness of his actions." The doctor also noted Petitioner "asked police to kill him[]

---

[1] It is the policy of this court not to use the names of minor victims, so we will use their initials out of respect for their privacy.

because he did not want to be incarcerated for the rest of his life. This indicates he understood his actions were legally wrong."

## A. Guilty Plea

On December 17, 2020, Petitioner pleaded guilty to Counts One, Two, and Three pursuant to a plea agreement. On the first degree murder charge, the trial court sentenced Petitioner to life imprisonment. On the two attempted first degree murder charges, the court sentenced Petitioner to twenty years' imprisonment, to be served concurrently with each other, but consecutively to his life sentence, for an effective term of life plus twenty years. Petitioner informed the court that he was on medication at the time he pleaded guilty, but he denied that the medication affected his ability to understand what he was doing and to understand the plea process. Initially, Petitioner stated that he would not waive his right to remain silent. The court informed him that the hearing could not proceed unless he waived his right to remain silent which Petitioner did. The court proceeded:

> If at any point you're confused about something we're doing or you have a question, just stop me, raise your hand and I'll let you talk to your attorney and have all your questions answered.
>
> All right, also if you don't want to do this guilty plea today, and you change your mind, do not plead guilty. All right, I'm not going to make you plead guilty, the State isn't, and your attorney isn't. So if you don't want to do this guilty plea, just let me know, I'll stop the process and I will set a jury trial for you as quick as possible.

Petitioner stated that he understood, and the hearing proceeded.

The trial court reviewed Petitioner's plea of guilty and waiver of rights forms with Petitioner, and asked him whether he understood the contents and whether his attorney had discussed each form. Petitioner answered yes to both questions and stated that he did not have any questions for his attorney. Petitioner stated that he understood his right to plead not guilty and proceed to trial, his right to confront and cross-examine witnesses at trial, and his right against self-incrimination. Petitioner assured the trial court that he was waiving those rights. Petitioner stated he was freely and voluntarily entering his guilty pleas, and that he had discussed the matters fully and thoroughly with his attorney. The State read the charges against Petitioner, and the court asked Petitioner if he understood the charges against him. Petitioner responded, "I do." The court then asked, "Do you understand the maximum sentence range, punishment, and fine you could face, if convicted of all three of these charges at trial?" Again, Petitioner responded, "I do." The State then reviewed the agreed-to sentence:

> Your Honor, our recommendation under the first degree murder is life in prison.
>
> The recommended sentence in . . . both counts of attempted first degree murder would be [twenty] years, Your Honor, to run together, but consecutive to the life sentence. So it's life in prison, plus the [twenty] years, Your Honor.
>
> I will mention that attempted first degree murder falls under that statute where there's a mandatory minimum [eighty-five] percent service before he's eligible to be paroled on that. And of course, as I mentioned earlier in this plea proceeding, life in prison presently calculates out to about [fifty-one] years. That doesn't mean that you get parole, that means you serve that before you're eligible. So it's life plus [twenty], Your Honor, with all the issues dealing when he can be eligible for any sort of parole.

The court asked Petitioner if he heard and agreed to the terms of his sentence, and Petitioner responded that he did. The court asked Petitioner once more if he had any questions for his attorney, and Petitioner responded that he did not, and that he was satisfied with his attorney's representation. The court then accepted Petitioner's guilty pleas.

Petitioner did not file a direct appeal of his convictions or sentences, but on August 18, 2021, filed a timely pro se petition for post-conviction relief. After the post-conviction court appointed counsel to Petitioner, he filed an amended petition for post-conviction relief.

## B. Post-Conviction Hearing

A post-conviction hearing was held on June 29, 2023 before the same Circuit Court judge who had accepted Petitioner's guilty pleas. Two witnesses testified: Petitioner and his trial counsel ("Counsel"). Petitioner testified that after Counsel was appointed to him, they discussed the facts of his case the first time they met. Petitioner thought it was important that Counsel knew he had no prior criminal history. Petitioner said he informed Counsel that he had "no idea" what he had done, and he thought that issue was important to his case, especially when it came to possible defenses. When asked if Counsel indicated whether his alleged memory loss might be important for a defense strategy, Petitioner responded, "Yes, she said she needed to get my medical records." Petitioner described his medical history, stating that he had a "tumor" removed from his "nasal passage," three heart attacks, and at the time of the "incident," he was being treated for COVID. He said that personnel at the county jail also informed Petitioner that he was "infected with the syphilis virus."

- 4 -

Regarding possible defenses, Petitioner stated Counsel informed him that "crime of passion did not apply to [him]." He stated that he and Counsel met "maybe four" times, and the first two times, Counsel was "by the book" and "really interested in this case." After she had a hip replacement, Petitioner stated, it seemed as though Counsel "quit on [him]." When Counsel presented Petitioner with the State's plea offer, he "told her with [his] prior record . . . [he] deserve[d] a better plea deal." Petitioner alleged that Counsel replied, "[Y]ou're never going to get a better plea, this is the best plea you're going to get, and if you don't take this deal, you're going to get the death penalty." He stated that he took the plea deal to "avoid the death penalty." Petitioner then described his mental state during this time:

> I was seeing pictures on the floors. I was seeing goldfish float across a door, and you know, I was hearing, which I thought they was playing the [911] call over and over in my cell, and I said something to [an officer] about it. He said something to the sheriff about it. They told me that the [911] call is locked up, can't nobody get to it, but I was still hearing it, night and day, so I'm not really sure what kind of shape I was in. I wasn't in good shape.

Petitioner stated he informed Counsel that he was having recurrent headaches, and on the day of the plea deal, he said he "wasn't really there":

> I was relying on [Counsel's] advise [sic] because she has the years of experience, she has the wisdom and the knowledge of the law, which what I knew about the law she could have put in the palm of her hand. So I took her advise [sic] in order to avoid the death penalty, and accepted this plea. And when, you know, she let the Judge know this is what you want 'cause in my mind I'm avoiding the death penalty.

Petitioner affirmed that at the time of the post-conviction hearing, he was "in a better space mentally than [he was] back at that time[.]" He asserted that if he had been in his improved "mind set" at the time of the plea hearing, he would not have agreed to plead guilty. He affirmed that he "would have wanted a different mental evaluation[.]"

On cross-examination, Petitioner reiterated that Counsel told him "if [he] didn't take this deal, [he] was going to get the death penalty." He said he was unaware of the plea negotiations that went on between Counsel and the State, and he added that he had asked Counsel to advance a crime of passion defense. When asked about his mental evaluation report, he recalled that it said he "wasn't a paranoid schizophrenic, but [he] had paranoid schizophrenic tendencies."

- 5 -

Counsel testified that by the time she was appointed to represent Petitioner, she had been practicing around thirteen years, and as an Assistant Public Defender, she had represented "thousands of clients." She acknowledged that she had an ethical obligation to prevent defendants from going through the plea process if she felt her client was incapacitated or unable to understand the plea. She stated that she had represented incapacitated defendants in the past, but she believed Petitioner was not in that position because he did not exhibit any behavior that gave her pause as to whether he was competent. Counsel affirmed that Petitioner told her he had no criminal history, and she noted that was "unusual" for the type of crime he committed. After Petitioner underwent a mental evaluation, Counsel said she had "no reason to think that . . . [the doctor's] expert opinion was not correct." She did not think another mental evaluation would have revealed "something more helpful to the case." When asked whether Petitioner's mental evaluation focused more on Petitioner's condition at the time of the evaluation instead of the time when the crimes were committed, Counsel explained that Petitioner's reports about his mental condition were consistent from their initial conversation up to the time of the evaluation.

Counsel acknowledged that while there was no proof of planning, no attempt to conceal his crimes, and although Petitioner was in an "agitated state" when emergency personnel arrived, the 911 call was enough to quash any argument against premeditation. When Counsel was specifically asked whether lack of premeditation would have been a viable defense, she stated:

> We discussed the [911] tape. We actually listened to the [911] call. The play by play from the wife where he goes down the stairs and . . . hear[d] her telling the kids to run because he's gone downstairs where the guns are. So I explained that, you know, more than likely that it would be premeditation, but we would certainly attempt to make it not.

She also said that she and Petitioner discussed the possibility that the yelling during the 911 call could have been evidence of excitement and passion.

On cross-examination, Counsel stated that she and Petitioner discussed premeditation and recognized that the 911 call made it "fairly clear that [Petitioner] had time to step back from his actions." She recalled the medical opinions on Petitioner's mental health and stated, "They ultimately said it was he was malingering. Ultimately, they opined that he was not suffering from a significant mental illness and that he was ultimately trying to exaggerate any symptomology that he might have in an effort to create a defense."

Regarding discussions of the death penalty, Counsel testified that at Petitioner's preliminary hearing, the State had indicated that it was considering seeking the death penalty. She later mentioned, however, that "the State never filed an intent to seek the death penalty against [Petitioner]." She negotiated with the Assistant District Attorney General to reach a plea agreement, but the District Attorney General was also involved and had to approve any deal that was proposed. Counsel stated she worked on Petitioner's case for close to a year, and before Petitioner pleaded guilty, she went over his rights with him, explained that he was not forced to plead guilty, and explained that he was free to plead not guilty and have a jury trial. She stated that due to the nature of the crime, her supervisor was involved in the case, and she was ready to prepare for a jury trial if Petitioner had taken that route. She also stated, "[Petitioner]'s biggest decision . . . was that he was really concerned about his boys having to testify at a trial."

The post-conviction court considered the transcript from Petitioner's guilty pleas and stated:

> I see no aspect in this . . . transcript where [Petitioner] seems confused or is exhibiting any type of behavior that would give me pause. And I've done that before, I've stopped the plea before and said, I -- we might do this on a different day. Maybe the person's tired, maybe they're on medication, maybe they're just not having a good day, let's put it off on another day. I would absolutely never accept a plea especially one of this, where I had any reservation about somebody's mental capacity. So I didn't see anything obviously that day because I went through with the plea.

The court noted that during the plea colloquy, it reviewed all relevant forms with Petitioner, discussed his rights, and asked him several times if he had any questions or concerns. The court also noted that during the guilty plea hearing, the State explained the charges against Petitioner, and Petitioner stated he understood the charges as well as his sentencing range. Petitioner agreed the State's recitation of the facts were true, and told the court that he and Counsel had discussed them. The court then stated, "I find there is no evidence that [Counsel] was ineffective at all in her representation or in—or that she made any sort of promises to him that—that would . . . nullify the plea." The court then stated, "looking at [Petitioner's] medical proof, there is no medical proof that was shown to me that he was incompetent or unable to understand what he was doing the day that he entered the plea. He was deemed competent to the forensic evaluation."

The post-conviction court announced it was denying Petitioner's petition for post-conviction relief. Subsequently, the post-conviction court submitted a detailed written order with findings of fact and conclusions of law. Notably, the post-conviction court found:

- 7 -

2. Petitioner was appointed [Counsel], who at the time of the plea had approximately thirteen years of experience as a defense attorney and had represented well over one thousand clients.

. . . .

4. [Counsel] and [Petitioner] met numerous times prior to the plea of guilty entered by [Petitioner]. During these meetings, it was conveyed to [Petitioner] that he had been offered a plea of guilty to [first] degree murder against his wife, carrying a sentence of life without the possibility of parole. Additionally, the plea offer required a plea of guilty to two counts of attempted murder against his two sons, which carried two twenty[-]year sentences running concurrent to each other but consecutive to the life sentence. In exchange for this plea, the [S]tate would not seek the death penalty. [Counsel] explained all aspect[s] of the plea to [Petitioner].

5. [Petitioner] told his attorney he would take the plea to avoid the death penalty and to avoid the necessity of making his two sons testify at trial.

6. During incarceration while awaiting a disposition, [Petitioner] complained of having mental issues and hallucinations while being incarcerated. [Petitioner] did not make these claims at the time the crimes were committed.

7. [Counsel] requested a mental evaluation for [Petitioner]. The results of said evaluation found [Petitioner] competent to stand trial. [Counsel] spoke to the Psychologist who conducted the evaluation who believed [Petitioner] was exaggerating or lying about his condition.

. . . .

10. During the plea process, this [c]ourt saw no issues or concerns with [Petitioner's] appearance, behavior, mental and emotional state, and his voluntary, knowing, and intelligent entering of the plea of guilty.

11. As found in the plea transcript, this [c]ourt asked [Petitioner] numerous times if he had any questions of his attorney, which he never did. This [c]ourt asked him if he was satisfied with his attorney, he affirmed he was. This [c]ourt went over all [Petitioner's] constitutional rights with [Petitioner] including his right to appeal the conviction and sentence if convicted at trial.

[Petitioner] knowingly, voluntarily, and intelligently acknowledged and waived all of these rights under oath.

. . . .

16. This [c]ourt did not find [Petitioner's] testimony in regards to his undocumented and uncorroborated claims that he lacked the mental capacity to enter his pea knowingly, voluntarily, and intelligently to be credible.

17. This [c]ourt does find that [Counsel's] testimony regarding her diligent representation of [Petitioner] and her belief that he was in a proper mental state to enter his plea knowingly, voluntarily, and intelligently to be credible.

18. That [Counsel's] legal representation of [Petitioner] was effective.

. . . .

20. At the conclusion of [Petitioner's] plea of guilty, this [h]onorable [c]ourt found [Petitioner] entered his plea knowingly, voluntarily[,] and intelligently and that there was a factual basis for the plea.

The post-conviction court also made the following conclusions of law in its written order:

1. Pursuant to Rule 11, Petitioner's plea of guilty was entered knowingly, voluntarily, and intelligently and that there was a factual basis for the plea.

2. [Petitioner] received effective assistance of counsel before the plea of guilty and during the entering of the plea.

3. [Petitioner] was competent at the time the plea of guilty was entered.

4. [Petitioner] understood, acknowledged, and knowingly, voluntarily, and intelligently waived all applicable constitutional rights necessary to enter his plea of guilty.

5. [Petitioner] affirmed under oath that no one threatened, forced[,] or coerced him to enter his plea of guilty.

6. [Petitioner's] belief he should have got a better plea offer or that at trial the jury may not have believed his actions were premedi[t]ated are not legal grounds to set aside a plea of guilty.

Petitioner filed a timely notice of appeal on July 28, 2023.

## II. Analysis

On appeal, Petitioner contends he was denied the effective assistance of counsel because Counsel failed to "investigate facts and develop a defense regarding mental capacity," and "advocate zealously" in allowing Petitioner to enter a plea that was not knowing, intelligent, and voluntary. The State argues the post-conviction court properly found Petitioner's claim of ineffective assistance of counsel to be without merit and that his pleas were knowing, intelligent, and voluntary. We agree with the State.

To obtain post-conviction relief, a petitioner must establish his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A petitioner bears the burden of proving the factual allegations contained in the petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 296 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

On appeal, a post-conviction court's factual finding will not be disturbed unless the evidence contained in the record preponderates against the findings. *Brooks v. State*, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988); *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). Assessing the credibility of witnesses is a matter entrusted to the post-conviction judge as the trier of fact. *R.D.S. v. State*, 245 S.W.3d 356, 362 Tenn. (2008) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). As a result, an appellate court is "not free to re-weigh or re-evaluate the evidence, nor [is it] free to substitute [its] own inferences for those drawn by the post-conviction court." *Whitehead*, 402 S.W.3d at 621 (citing *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001)). On the other hand, conclusions of law are given no presumption of correctness on appeal. *Dellinger*, 279 S.W.3d at 293; *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

### A. Ineffective Assistance of Counsel

The Constitutions of the United States and the State of Tennessee guarantee criminal defendants the right to effective assistance of counsel. U.S. Const. amend VI; Tenn. Const.

art. I, § 9. Under the Sixth Amendment to the United States Constitution, when a petitioner raises an ineffective assistance of counsel claim, the burden is on the petitioner to show both (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockart v. Fretwell*, 506 U.S. 364, 368-372 (1993). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). To prevail on such a claim, a petitioner must prove both prongs of the *Strickland* test, and failure to prove either is "a sufficient basis to deny relief on the claim." *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "[A] court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

To prove that counsel's performance was deficient, a petitioner must establish that his attorney's conduct fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. As our supreme court held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 934-35 (Tenn. 1975)). A reviewing "court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation." *Alley v. State*, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). A reviewing court cannot criticize a sound, but unsuccessful, tactical decision made during the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

To prove prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability [means] a probability sufficient to undermine confidence in the outcome." *Id.* As such, a petitioner must establish that his or her attorney's deficient performance was of such magnitude that he

was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

Petitioner argues Counsel did not investigate "the strategies available as possible defenses in a jury trial, including lack of premeditation." In its written order, the post-conviction court found that Counsel and Petitioner met numerous times leading up to Petitioner's guilty plea. The post-conviction court did not find Petitioner to be credible. Conversely, it did find Counsel credible. At the post-conviction hearing, Counsel explained that the 911 call would quash the possibility of premeditation because you can "hear her telling the kids to run because he's gone downstairs where the guns are." Still, Counsel stated if they went to trial, "we would certainly attempt to make it not." The post-conviction court noted that Petitioner was satisfied with Counsel.

Ultimately, the post-conviction court found that Counsel was effective. After our review, we conclude that nothing in the record preponderates against the post-conviction court's findings. *See also Merritt v. State*, No. W2021-01448-CCA-R3-PC, 2022 WL 17077555, at *13 (Tenn. Crim. App. Nov. 18, 2022), *perm. app. denied* (Tenn. Mar. 8, 2023) (concluding the post-conviction correctly determined trial counsel was effective when the evidence did not preponderate against its findings); *Payne v. State*, No. E2021-01017 CCA-R3-PC, 2022 WL 3683793, at *8 (Tenn. Crim. App. Aug. 25, 2022), *no perm. app. filed*.

## B. Guilty Plea

Petitioner argues he did not enter his guilty plea voluntarily and knowingly as required by *Boykin v. Alabama*, 395 U.S. 238 (1969). Indeed, a criminal defendant must enter a guilty plea voluntarily, knowingly, and intelligently, and the record must demonstrate that the plea satisfies these requirements. *State v. Crowe*, 168 S.W.3d 731, 748 (Tenn. 2005) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)); *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (internal citations omitted). Trial courts ensure that guilty pleas are proper by advising and questioning the defendant about the plea, confirming the plea is voluntary, and finding a factual basis for the plea. Tenn. R. Crim. P. 11(b). "The validity of a guilty plea is a mixed question of law and fact." *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (citing *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003)). An appellate court reviews "mixed questions of law and fact de novo" with a presumption of correctness only to the post-conviction court's factual findings. *Id.*; *Merritt*, 2022 WL 17077555, at *12.

It is a petitioner's burden to offer "independent corroboration that he was incapable of making a rational decision" when the petitioner asserts that mental health issues affected the plea. *Buie v. State*, No. M2022-01232-CCA-R3-PC, 2024 WL 242791, at *5 (Tenn.

Crim. App. Jan. 23, 2024) (quoting *Burrell v. State*, No. M2015-02115-CCA-R3-PC, 2017 WL 943363, at *11 (Tenn. Crim. App. Mar. 9, 2017)).

Petitioner argues that he was suffering from auditory and visual hallucinations as well as physical ailments at the time of his guilty plea. Counsel stated Petitioner did not exhibit any behavior that gave her pause as to whether he was competent. After Petitioner underwent a mental evaluation, Counsel said she had "no reason to think that . . . [the doctor's] expert opinion was not correct" and did not think another mental evaluation would have revealed "something more helpful to the case." Counsel also explained that Petitioner's reports about his mental condition were consistent from the time of their initial meeting through Petitioner's evaluation.

The post-conviction court noted that Petitioner told Counsel he would take the plea to avoid the death penalty and to avoid making his sons testify at trial. It also found that while Petitioner complained of mental issues and hallucinations while incarcerated, he did not make the claims at the time of his offenses. The post-conviction court found that Counsel requested a mental evaluation and the results were that Petitioner was competent to stand trial. The psychologist who evaluated Petitioner said he was malingering about his condition. The post-conviction court "saw no issues or concerns with [Petitioner's] appearance, behavior, mental and emotional state, and his voluntary, knowing, and intelligent entering of the plea of guilty." The post-conviction court found Petitioner knowingly, voluntarily, and intelligently acknowledged and waived all of his constitutional rights. Again, the post-conviction court did not credit Petitioner but did credit Counsel on this issue. Moreover, Petitioner "failed to offer the testimony of a mental health professional or any mental health records to substantiate his claim that he was incapable of making a rational decision." *Buie*, 2024 WL 242791, at *5.

After review, we conclude that Petitioner failed to support his claim with independent corroborative proof that he could not make a rational decision. *See, e.g.*, *id.* at *5-6; *Burrell* 2017 WL 943363, at *11. We also conclude the evidence supports the post-conviction court's finding that Petitioner's plea was knowingly, voluntarily, and intelligently made, and there was a factual basis for the plea. Accordingly, Petitioner is not entitled to relief.

Petitioner separately argues Counsel failed to "advocate zealously for him by allowing him to enter a plea that was not knowing, intelligent, and voluntary" and should have sought to delay the plea hearing. "[P]lea counsel's 'effectiveness may implicate the requirement that a plea must be entered knowingly and voluntarily . . . .'" *Merritt*, 2022 WL 17077555, at *13 (quoting *Johnson v. State*, No. W2015-02498-CCA-R3-PC, 2017 WL 192710, at *4 (Tenn. Crim. App. Jan. 17, 2017)). Yet, earlier in this opinion, we concluded that Petitioner failed to establish he received the ineffective assistance of

- 13 -

counsel, that Petitioner entered his plea knowingly, voluntarily, and intelligently, and that there was a factual basis for the plea.  As such, we conclude Petitioner's guilty pleas "were not rendered unknowing or involuntary due to any alleged ineffective assistance by counsel." *Id*.  (citing *Payne*, 2022 WL 3683793, at \*8).

### III. Conclusion

After our review of the record, briefs, and applicable law, we affirm the judgment of the post-conviction court.

_____
MATTHEW J. WILSON, JUDGE

- 14 -